```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
                       EASTERN DIVISION

JONATHAN O'DELL and              )
KRISTI O'DELL,                   )
                                 )
           Plaintiffs,           )
                                 )
     v.                          )    No. 4:05 CV 2090 DDN
                                 )
SPECIAL SCHOOL DISTRICT OF       )
ST. LOUIS COUNTY,                )
                                 )
           Defendant.            )
```

**MEMORANDUM OPINION**

This action is before the court for a decision on the merits of the claims of plaintiffs Jonathan O'Dell and Kristi O'Dell against defendant Special School District of St. Louis County. Pending are the parties motions for judgment based upon the administrative record and the arguments in their memoranda. (Docs. 44, 46.) The parties have consented to the authority of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Pleadings

Plaintiffs Jonathan O'Dell and Kristi O'Dell, as parents and legal guardians of minor child N.O., brought this action against defendants Special School District of St. Louis County (Special School District) and Martha Disbennett,[1] the Director of Special Education of the Special School District. Plaintiffs invoke their rights under the federal Individuals With Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., and allege that defendant Special School District violated the IDEA by denying N.O. access to a Free Appropriate Public Education (FAPE). Plaintiffs seek de novo judicial review of the decision of the administrative hearing panel.[2]

---

[1]Plaintiffs' claims against defendant Martha Disbennett have been dismissed. (Doc. 40.) Only the claim against the defendant Special School District remains for decision.

[2]The administrative hearing panel is denominated "The Three-Member Due Process Hearing Panel Empowered Pursuant to Section 162.961, RSMo." The final decision of the administrative hearing panel is found in the

The court has subject matter jurisdiction over the action under 20 U.S.C. § 1415(i).

## II. General Legal Standards

In determining the parties' rights under the IDEA and in deciding the claims of the plaintiffs, the court must consider the record of the state administrative proceedings that led to the decision being reviewed, may consider additional evidence, and must decide the case based upon findings of fact decided by a preponderance of the evidence. Id. at § 1415(i)(2). In challenging the state administrative decision, the plaintiffs have the burden of proof. E.S. v. Independent. School Dist. No. 196, 135 F.3d 566, 569 (8th Cir. 1998).

## III. Findings of Fact

1. Plaintiffs are the parents of N.O., a girl born November 29, 1999. Defendant is the Special School District of St. Louis County (Special School District) and provides special education services[3] to students in 15 public school districts, including Parkway C-2 School District, where N.O. and her parents reside. At all times relevant, N.O. attended the Carman Trails Elementary School (Carman Trails) which is in the Parkway C-2 School District. Carman Trails has an early childhood special education program for children ages three to five. (Doc. 15 Ex. 2 at 4.)

---

record at Doc. 51 Exhibit A.

[3]Under Missouri's Special Educational Services Act, "special educational services" are defined as

> programs designed to meet the needs of handicapped or severely handicapped children and which include, but are not limited to, the provision of diagnostic and evaluation services, student and parent counseling, itinerant, homebound and referral assistance, organized instructional and therapeutic programs, transportation, and corrective and supporting services.

Mo. Rev. Stat. § 162.675(4) (2005 Cumulative Supplement).

2. In Carman Trails's special education program children needing special education programs are taught with children who are not so diagnosed, the latter being considered "model" children in the classroom. In the fall of 2002, plaintiffs met with an employee of Carman Trails to discuss N.O. attending Carman Trails as a model student in the special education department. N.O.'s parents did not ask that she be evaluated for special needs. N.O. began attending Carman Trails as a model student on December 2, 2002. At that time, N.O. was not identified as a child with a disability, nor was she provided an Individualized Education Program (IEP).[4]

3. On N.O.'s first or second day of school, Mary Busch, a special education teacher, and Joy Coulis, a speech pathologist at Carman Trails, spoke with plaintiffs about screening N.O. because they were worried about N.O.'s socialization skills, eye contact, and lack of following directions. In early December 2002, the Parkway C-2 School District initiated screening activities on N.O., which evaluated her need for special education. At the recommendation of her teachers, N.O. was recommended for special education screening in the areas of language, gross motor skills, social and emotional skills, and adaptive behavior. (Doc. 32 Book 1 at 53-71.)

4. With the consent of her parents, N.O. was evaluated on January 23, 2003. The evaluation included the parents' concerns about N.O.'s communication development; her parents were not concerned about her motor skills. Busch noted N.O. was not able to verbally make her needs or wants known. N.O. was observed at Carman Trails on two occasions as part of the evaluation, and was also assessed in communication, physical development, adaptive behavior skills, and social and emotional behavior. Based on this evaluation, N.O. was diagnosed as a <u>Young Child with a Developmental Delay</u> in the areas of communication, social and

---

[4]An IEP is a written statement that includes, among other things, the child's present level of academic achievement and functional performance, the child's special education needs, measurable annual goals, a procedure for progress reports, and any supplemental aids and services needed. 20 U.S.C. § 1414(d); <u>M.P. v. Independent School Dist. No. 721</u>, 326 F.3d 975, 977 n.1 (8th Cir. 2003). It is prepared jointly with school staff and parents, and is reviewed annually. <u>M.P.</u>, 326 F.3d at 977, n.1.

emotional behavior, and adaptive behavior. In reaching this diagnosis, the evaluation team referred to the diagnosis definition established by the Missouri Department of Elementary and Secondary Education, <u>i.e.</u>, a condition requiring "a significant delay (2.0 standard deviations) be documented in one (1) developmental area or a significant delay (1.5 standard deviations) in two (2) developmental areas." The team found the requisite delays in the areas of communication development (-1.5 standard deviations), social/emotional/behavioral development (-2 standard deviations), and adaptive behavior (-1.5 standard deviations). Plaintiffs indicated generally that they were satisfied with the evaluation. (Doc. 32 Book 1 at 72-77.)

    5.  N.O. began attending Carman Trails School four days per week in January 2003. On January 27, 2003, N.O.'s parents received a written Notification of Meeting to develop an initial IEP for N.O. The persons expected to attend were named. (Doc. 32 Book 1 at 94.) The meeting was held as scheduled and N.O.'s parents met with Busch and Coulis. Together they developed a 12-page Individualized Education Program (IEP) for N.O. Future services, such as music therapy, were also discussed at the February 2003 meeting.

    6.  The IEP included a Present Level of Educational Performance (PLEP) for N.O. The PLEP described N.O. as a young child with developmental delay in the areas of social/emotional, adaptive behavior, and communication which affect her involvement in regular preschool. The specific concerns were stated as involving her ability to consistently respond to her name, to imitate, to socialize meaningfully with her peers, to express herself, to use age-appropriate materials and tools, to "transition smoothly," and to participate in group activities. The PLEP noted her strengths. It noted her parents' concerns: her communication development, her ability to follow a routine and to transition, her ability to remain in group activities, her ability to interact with her peers, her ability to listen, and her self-help skills. Relevant results of the January 23 evaluation were stated: she had moderate delay in the areas of communication, adaptive behavior, and social/emotional skills. The IEP established four measurable goals and benchmark objectives for N.O. for the following year:

1. N.O. will respond to her name, four out of five opportunities.

2. N.O. will imitate a variety of movements, four out of five opportunities.

3. N.O. will use words to greet, depart, comment, request and protest, four out of five opportunities.

4. N.O. will produce up to four or five play schemes and react with teachers and peers four out of five opportunities.

Each goal had one or more benchmarks and objectives. (Doc. 33, Book 1 at 82-93.) The IEP further called for 660 minutes per week of Early Childhood Special Education Instruction and 60 minutes per week of language therapy. (Doc. 33, Book 1 at 87.) The February IEP programs were to begin on February 10.

7. On February 20, 2003, plaintiffs took N.O. to Garrett Burris, M.D., a pediatric neurologist. In his February 20, 2003, letter report Dr. Burris opined that N.O. fell within the autism spectrum, "albeit mild." More specifically, after stating essentially normal physical examination results, Dr. Burris stated:

> She is alert. She did not establish eye contact. She did follow directions that I gave her. She was able to point to pictures for a period of time and then became quickly bored with this. She was able to identify pictures, and at one point identified a seahorse. She is able to recognize colors. She recognizes all of her letters and her mother states that she is able to read three to four words. She recognizes a circle, triangle, and square.
>
> Her gait is normal. She is moderately hypotonic, but has good strength and symmetric deep tendon reflexes. She has intact cranial nerves. Gait is normal.
>
> It is my impression that this is a child **who falls within the autistic spectrum, albeit mild** in view of what I believe to be of average to above average intellect as well as normal language development.
>
> I believe a program of behavioral management should be incorporated into her preschool program perhaps with the help of a PDD facilitator in addition to current plans for her early childhood program.

(Doc. 33, Book 1 at 122-23)(emphasis added). Dr. Burris's letter itself was not provided to defendant until July 7, 2004, although N.O.'s mother

told Coulis that Dr. Burris had given a diagnosis of Pervasive Developmental Disorder (PDD) Not Otherwise Specified, which is on the autism spectrum, shortly after the letter report was issued. For educators in the Special School District, there is a substantial difference between a medical diagnosis of autism and an educational diagnosis of autism. The latter involves considering the child's specific abilities and limitations in areas of educational concern. (Tr. Vol. III at 694-98.)[5]

    8. In May 2003, N.O.'s IEP was reevaluated. At her parents' request, it was recommended that N.O. get additional testing in the areas of occupational therapy, music therapy, and Applied Behavioral Analysis (ABA), which includes behavior modification therapy. It was noted that N.O. was making progress on the current goals, and that her parents requested a reevaluation to consider one-on-one intervention. At the end of the school year in 2003, N.O.'s mother indicated she was staying well informed about her child's progress,[6] and the parents generally were pleased with it. (Doc. 51 Ex. A at 11-14; Tr. Vol. V at 1128-29, Vol. VI at 1376-78.)

    9. On June 25, 2003, N.O., at the age of 3 years and 6 months, underwent an occupational therapy evaluation at St. Louis Children's Hospital, in which the Special School District did not participate. The reason for the evaluation was to follow up on Dr. Burris's diagnosis of Pervasive Developmental Disorder. N.O.'s mother described to the evaluating therapist N.O.'s actions which indicated sensory issues. Following the testing, the therapist noted a diagnosis of "sensory disturbance" and the following areas of concern: tactile sensitivity, movement sensitivity, auditory defensiveness, and decreased endurance/muscle tone. The therapist recommended

---

[5] Citations to "Tr. Vol. ___ at ___" are references to the transcript of the evidentiary hearing before the three-member state administrative panel.

[6] Coulis sent home weekly "What I did in speech today" reports, and Busch had monthly contact with the parents about N.O.'s progress during the 2002-2003 school year. Busch spoke with plaintiffs twice in April 2003 about N.O.'s ABA evaluation. (Doc. 32 Book 1 at index, Doc. 51 Ex. B at 11.)

      that [N.O.] be seen one time a week for 60 minutes to address
      the concerns that were stated above. Treatment plan to
      include activities that will assist in modulation of her
      sensory environment, and a home program that will provide
      suggestions and activities for parents to carry out at home.

(Ex. R-43.)[7]

    10. Carman Trails School performed its own occupational therapy evaluation in the fall of 2003, and recommended that N.O. receive occupational therapy.

    11. On August 22, 2003, N.O. was again seen by Dr. Burris. In his letter report of the same date, he noted

      Diagnostically, this is a difficult child to place precisely,
      although I believe that she has some autistic spectrum
      qualities and that she appears to be intelligent and
      developing language. She continues to have significant
      problems with play and social interaction.

(Doc. 32 Book 2 at 255.) His letter report was not provided to defendant until after the 2003-2004 school year. (Doc. 51 Ex. A at 13-15.)

    12. On October 12, 2003, Kelly Fagala, an independent contractor for the Special School District, evaluated N.O. for music therapy and opined that N.O. was very motivated and assisted by music therapy strategies. Ms. Fagala recommended that N.O. continue to receive music therapy. The October 14, 2003 report was submitted to N.O.'s IEP Team, which included N.O.'s parents. (Doc. 32 Book 2 at 380-85; Doc. 32 Ex. R-63.)

    13. Julie Snider, who was employed by the Special School District, evaluated N.O. to determine if she needed ABA therapy. In her report dated October 17, 2003, Snider determined that N.O. may benefit from ABA therapy. (Doc. 51 Ex. A at 15-16; (Ex. R-64.)

    14. On October 17, 2003, plaintiffs and representatives of the Special School District met to review the latest evaluation assessments. (Doc. 32 Exs. R-65, 66.)

---

    [7]Citations to exhibits denominated "Ex. R-__" are references to exhibits received into evidence during the hearing before the Three Member Due Process Panel.

15. A written Occupational Therapy Report by Special School District therapist Jeanie Hall was completed on October 24, 2003. The written report described N.O.'s abilities to grasp, to combine her visual and motor skills, her sensory needs, the fact that she is very tactile and craves movement, and her auditory and visual processing. The report concluded that N.O. "presents with a mild delay in fine motor skills and significant difficulty with sensory integration. It is recommended that she receive occupational therapy services to support her education." (Id. at Ex. R-69.)

16. On October 29, 2003, outside evaluator Debra Kornmann observed N.O. in the classroom at plaintiffs' request. Kornmann noted N.O. was easily redirected by her teacher, and opined N.O. was able to be successful in the Carman Trails classroom. She was not allowed by Carman Trails to observe N.O. in the classroom at any other time. (Doc. 32 Ex. R-71, 72; Doc. 51 Ex. A at 15-18; Doc. 44 Attach. 2 at 5.)

17. During fall meetings of the plaintiffs and representatives of the Special School District, Ms. Kornmann attended. On October 17, 2003, teacher Mary Busch provided N.O.'s parents with a written Notification of Meeting, which scheduled a meeting for October 30, 2003, to review and revise N.O.'s IEP. At the meeting, it was determined that N.O. had met goals one and two of the February 7, 2003 IEP, and was making significant progress towards goals three and four. The parties met again on November 4, 2003, November 10, 2003, November 19, 2003, and December 3, 2003, for two to three hours at a time. By December 2003, N.O. showed improvements in using words to request, comment, protest, and respond to her name; there were emergence of play schemes, an improved level of play, and improvement overall in all development areas. N.O. received substantial benefit from the February 2003 IEP and progress in her development was noted. (Doc. 32 Book 3 at 530-38.)

18. The meetings resulted in a new IEP being developed for N.O., dated December 3, 2003; it was to go into effect on December 13. This IEP of 21 pages described the ways in which the areas of development in which she was delayed (communication, adaptive behavior, and social/emotional skills) affected her involvement in regular preschool education. Her strengths were noted, as were the areas of her parents'

concerns. The IEP noted that she demonstrated changes since her previous IEP. The IEP contained 16 goals and related benchmarks and objectives for the following year for N.O.: (1) respond to her name four out of five opportunities; (2) imitate a variety of movements four out of five opportunities; (3) use words to greet, depart, comment, request and protest four out of five opportunities; (4) produce up to four to five part play schemes and interact with teachers and peers four out of five opportunities; (5) produce up to six to eight part play schemes in three different center areas four out of five opportunities; (6) demonstrate awareness of her peers by engaging in specified activities four out of five opportunities; (7) engage in play activities with peers for five turns, four out of five opportunities; (8) verbally communicate with peers for specified reasons four out of five opportunities; (9) follow specified directions four out of five opportunities; (10) produce a variety of pronouns in structured and unstructured settings four out of five opportunities; (11) recall and express classroom events four out of five opportunities; (12) establish eye contact before making requests with teachers and peers four out of five opportunities; (13) visually and physically attend to structured and unstructured tasks up to ten minutes four out of five opportunities; (14) demonstrate community and safety awareness by completing specific objectives four out of five opportunities; (15) demonstrate improved prewriting skills in specific ways; and (16) demonstrate improved use of scissors. The originally suggested definitions of goals 5 through 14 were altered to incorporate the suggestions of N.O.'s parents. (Id. at 477-98.)

19. The IEP prescribed for N.O. 525 minutes per week of early childhood special education, 90 minutes per week of language therapy, 60 minutes per week of occupational therapy, 30 minutes per week of music therapy, and 15 minutes per week of music therapy consultation. This IEP included suggestions made by plaintiffs. The increased goals showed that N.O. progressed from the February 2003 IEP, appropriately addressed her needs, and allowed her to receive meaningful educational benefit. 20. During the IEP meeting and after, especially by letters dated December 15, 2003, and January 7, 2004, plaintiffs requested

additional services be added to the December 2003 IEP, but the Special School District did not concur. Plaintiffs wanted 15 hours of in-home, one-on-one ABA, which the Special School District denied. (Doc. 32 Ex. R-84 at 520, 527.)

21. By letter dated January 8, 2004, plaintiffs wrote Mary Busch that they were beginning private, in-home instruction for N.O. Four hours of services were to be provided per week, including ABA services. Ms. Kornmann was providing these services. Kornmann agreed that the December 2003 IEP goals were appropriate. (Doc. 32, Book 3 at 622; Doc. 51 Ex. B at 23; Tr. 1535.) By letter dated January 16, 2004, the Special School District answered the concerns that plaintiffs had about the need for the additional services plaintiffs requested. (Doc. 32 Ex. R-97.)

22. By letter dated January 24, 2004, the Special School District therapist wrote N.O.'s parents describing her approach in working with N.O. and wishing to coordinate with plaintiffs' privately retained therapist. N.O. improved at music therapy, and therapist Fagala opined in February 2004 that N.O. no longer needed it. Her interaction with peers improved, even to asking them questions about toys they had at home, and she performed well at answering questions at circle time. (Doc. 51 Ex. B at 22; Doc. 32 Ex. R-99.).)

23. N.O. made progress in social interaction, among other areas, after the December 2003 IEP.

24. Plaintiffs requested a hearing before an administrative panel, and raised the following arguments:

1. The Special School District failed to evaluate N.O.'s disabilities and failed to craft an appropriate IEP.

2. The Special School District failed to provide the parents with adequate prior written notice for their actions in 2002-2003, and 2003-2004.

3. The Special School District failed to provide necessary services, thereby failing to provide a FAPE and requiring the parents to secure the services at their own expense.

4. The Special School District failed to address all of N.O.'s educational and social needs, and thereby failed to provide her with a FAPE.

5.  The Special School District failed to provide special education and related services designed to meet the student's needs.

(Doc. 51 Ex. A at 20.)

24. In a 2-1 decision dated October 3, 2005, a three-person administrative panel[8] found that N.O. was appropriately diagnosed by the Special School District, and that her needs were met. The panel found that the parents were adequately kept apprised of their child's education and received fair notices. Further, they were present at many meetings. The panel noted that the IDEA does not require the best possible education, but an educational program "reasonably calculated to enable the child to receive educational benefits." The panel found that the Special School District did not violate the IDEA. The dissenting panel member filed a separate opinion. (Doc. 51 Ex. A.)

## IV. Discussion

In this judicial action plaintiffs allege that the decision of the state administrative panel should be reversed, because:

1.  The IEP failed to include and identify all of the child's disabilities, failed to address the needs rising from those disabilities, and failed to provide N.O. with a Free Appropriate Public Education.

2.  The Special School District failed to provide plaintiffs with proper notice.

3.  The decisionmaking by the Special School District was flawed because the School District failed to include the parents, people knowledgeable about the student, failed to consider the parents' requests, and failed to consider the opinions of people knowledgeable about the student's disabilities.

4.  Reimbursement is the proper remedy for the Special School District's violation of the IDEA.

---

[8]Under Missouri law, the panel must be comprised of three individuals with knowledge or training involving children with disabilities. Mo. Rev. Stat. § 162.961. The parents select one member, the Special School District selects another, and the third member is selected by Missouri Department of Elementary and Secondary Education. Id.

(Doc. 44 Attach. 2.)

Defendant argues that plaintiffs did not exhaust their administrative remedies, and, in the alternative, that the decision of the administrative panel should be affirmed.

The IDEA requires that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(a). A free appropriate public education (FAPE) is "a 'basic floor of opportunity' so that a child with disabilities has access to an individually designed education." Stringer v. St. James R-1 School Dist., 446 F.3d 799, 802 (8th Cir. 2006) (quoting Yankton School Dist. v. Schramm, 93 F.3d 1369, 1372 (8th Cir. 1996)). "The IDEA does not require any state to provide more than meaningful access to education with some educational benefit." Id. at 803.

"The IDEA provides procedural safeguards to permit parental involvement in all matters concerning the child's educational program and allows parents to obtain administrative and judicial review of decisions they deem unsatisfactory or inappropriate." M.P. v. Independent School Dist., 326 F.3d 975, 979 (8th Cir. 2003). Among other things, the IDEA requires that parents be notified of any change in the IEP, that they be involved in discussions relating to their child, and that dissatisfied parents be entitled to a hearing. M.P., 326 F.3d at 979.

"When reviewing a school district's compliance with the IDEA's requirements after an administrative hearing, the district court should make an 'independent decision,' based on a preponderance of the evidence, whether the IDEA was violated." Pachl v. Seagren, 453 F.3d 1064, 1068 (8th Cir. 2006) (quoting Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1027-28 (8th Cir. 2003)). The court must give "due weight" to the administrative proceedings, and cannot substitute its own educational policy for that of the reviewing school authorities. Bd. of Educ. of Hendrick Hudson Cent. School Dist., Westchester Co. v. Rowley, 458 U.S. 176, 206 (1982); Pachl, 453 F.3d at 1068. The level of deference is less than the "substantial evidence" test used in most

administrative law cases, but the court still considers that the panel was present at the hearing and assessed the credibility and the persuasiveness of the evidence.

> [A] court's inquiry in suits brought under § 1415(e)(2) is twofold.  First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

Bd. of Education of Hendrick Hudson, 458 U.S. at 206-07.

This court has considered each of plaintiffs' arguments.

**A.   Whether the Special School District failed to identify N.O.'s disability**

Plaintiffs argue that the IEP crafted by the Special School District failed to identify and include all of N.O.'s disabilities, failed to address the needs rising from those disabilities, and failed to provided N.O. with a FAPE.  The administrative panel found that diagnosis alone does not drive the services to be provided to a student, and the IEP for N.O. was appropriate, given N.O.'s skills and limitations.  (Doc. 51 Ex. A at 21-23.)

Plaintiffs argue that the Special School District erred when it diagnosed N.O. as a Young Child with a Developmental Delay instead of finding that she had autism.  In developing each child's IEP, the IEP Team must consider–

> (i) The strengths of the child;
>
> (ii) The concerns of the parents for enhancing the education of their child;
>
> (iii) The results of the initial or most recent evaluation of the child; and
>
> (iv) The academic, developmental, and functional needs of the child.

34 C.F.R. § 300.324. The IEP team was not required under the regulations to consider a specific disability diagnosis, but rather to consider N.O.'s specific needs. Id.; Pachl, 373 F. Supp.2d at 975. Here, the IEP team did not err by not specifically focusing her IEPs upon the diagnosis of autism. Instead, the IEPs properly were constructed around N.O.'s educational abilities and limitations.

Plaintiffs argue that the IEPs did not contain the child's present level of educational performance or how the child's disability affected the child's involvement and progress. The administrative panel found that annual goals did not need to be stated with specificity, and that minor technical procedural violations should not lead to a finding of a denial of a FAPE. (Doc. 51 Ex. A at 22.) Here, the IEP team completed a Present Level of Educational Performance form (Book 1 at 83, Book 3 at 478), and the goals and objectives were appropriate for N.O. at that particular point in time. N.O.'s areas of developmental delay were identified, including the areas of concern described by her parents. N.O.'s strengths were described also. This was sufficient information by which to assess her development and the efficacy of the IEPs. See O'Toole v. Olathe School Dist., 144 F.3d 692, 706 (10th Cir. 1998) (no requirement that objective and goals be identified with any particular level of specificity).

The IEPs drafted for N.O. contained all of the required information. 20 U.S.C. § 1414(d); (Doc. 32, Books 1 and 3, at 82, 477.) N.O.'s needs were evaluated by the school on many occasions, and it was noted she was making progress from the February 2003 to the December 2003 IEPs. Further, her parents' concerns were considered; the record is very clear that they were very involved in N.O.'s education and the IEP process. (See Doc. 32, Books 1-5.)

There is no indication from the record before the court that the IEPs formulated for N.O. were deficient and denied her a FAPE.

**B. Whether plaintiffs received proper notice**

Plaintiffs argue that they did not receive proper notice of the actions defendant took regarding the creation of N.O.'s IEPs, as required by 34 C.F.R. § 300.503. Specifically, they argue that the Notices of Action they received after the December 2003 IEP meeting were vague and failed to describe "each evaluation, procedure, record, or report" defendant used in writing the IEP. Id. at § 300.503(b)(3). The administrative panel decided this issue against plaintiffs, because it found that Notices of Action were sent to plaintiffs when required and the notices adequately provided plaintiffs with the means to meaningfully participate in the meetings. (Doc. 51 Ex. A at 24.)

The court disagrees with plaintiffs. The very extensive record is clear that throughout the dealings between defendant and plaintiffs over the educational welfare of N.O. both defendant and plaintiffs provided a wealth of information about evaluations, procedures, records, and reports involving N.O. and her educational requirements and limitations. Plaintiffs received sufficient notice to ensure that they could and did participate in N.O.'s IEPs in a meaningful way. (Doc. 32 Books 1-5, at 66, 942c, 1029, 1123, 1124, 1125, 1157, 1159, 1160, 1174.)

**C. Whether the IEP Team was properly composed**

Plaintiffs argue that the decisionmaking by the Special School District was flawed because the School District failed to include the parents, people knowledgeable about the student, failed to consider the parents' requests (failed to treat the parents as equal partners), and failed to consider the opinions of people knowledgeable about the student's disabilities.

Defendant argues that the plaintiffs did not exhaust this issue because it was not raised before the administrative panel. (Docs. 47, 51.) The IDEA requires that the plaintiffs exhaust their administrative remedies before proceeding to federal court. Birmingham v. Omaha School Dist., 220 F.3d 850, 854 (8th Cir. 2000). Certain exceptions apply to this rule, such as futility and lack of adequate relief, none of which are argued to apply in this case. Blackmon v. Springfield R-XII School Dist., 198 F.3d 648, 656 (8th Cir. 1999).

Plaintiffs did not raise this claim in their administrative review hearing. They did not argue that the team selected to formulate N.O.'s IEP was flawed in any way, or that they were not involved, or that their opinions were not considered. (See issues, Doc. 51 Ex. A at 21.) Therefore, this ground must fail for failure to exhaust administrative remedies.

Even if plaintiffs had raised this issue before the three-person administrative panel, it would fail. When formulating the child's IEP, the school district must provide a team that includes the child's parents, at least one teacher or education provider of the child, a knowledgeable representative of the public agency, someone who is able to interpret the evaluation results, other persons with knowledge about the child, and the child when appropriate. 34 C.F.R. § 300.321(a); Gill v. Columbia 93 School Dist., 217 F.3d 1027, 1034 (8th Cir. 2000).

Parents may not only attend the IEP team sessions but may also participate in a meaningful way. Id.

> Parents who believe that their child would benefit from a particular type of therapy are entitled to present their views at meetings of their child's IEP team, to bring along experts in support, and to seek administrative review. The statute set up this interactive process for the child's benefit, but it does not empower parents to make unilateral decisions about programs the public funds.

Gill, 217 F.3d at 1038.

The parents were very involved with N.O.'s IEP formation. They attended meetings that were held regularly, including 15 hours of meetings in Fall of 2003. The parents were allowed to include their own expert, Debra Kornmann, in the process. Teachers who worked with N.O. every day were included in the process, as well as professionals who had evaluated her. All of the parents' ideas were considered, and some of them were adopted. Plaintiffs periodically disagreed with the Special School District's decisions, but mere disagreement is not a lawful basis for concluding that defendant Special School District did not properly apply the Individuals With Disabilities Education Act to provide N.O. the required Free Appropriate Public Education.

For the reasons set forth above, the motion of plaintiffs for judgment is denied. The motion of defendant for judgment is sustained. The motion to continue oral arguments is denied as moot. The decision of the administrative panel is affirmed.

    /S/ David D. Noce    
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 30, 2007.